

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-22-00065-CV

IN THE INTEREST OF A.R., B.R., JR., AND B.R., CHILDREN

On Appeal from the 336th District Court
Fannin County, Texas
Trial Court No. FA-21-45542

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

# MEMORANDUM OPINION

Based on allegations of abuse and neglect, the Department of Family and Protective Services filed a petition to terminate Mother's and Father's parental rights to their children, ten-year-old Anna, nine-year-old Ben, and five-year-old Brynn.[1] The children's maternal grandmother, Tanya, and her common-law husband, Aaron, intervened and asked to be named as the children's sole managing conservators. A Fannin County jury found that Mother's and Father's parental rights should be terminated and that neither Tanya nor Aaron should be named as conservators. Consequently, the trial court entered a judgment that terminated parental rights, dismissed the petition in intervention, and appointed the Department as the children's permanent managing conservator.

On appeal, Mother and Father challenge the sufficiency of the evidence to support the jury's findings that (1) they knowingly placed or allowed their children to remain in conditions or surroundings that endangered their physical or emotional well-being, as described by Ground D of the parental-rights termination statute; (2) they engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being, as described by Ground E;[2] and (3) termination of parental rights was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (b)(2). Tanya and Aaron also filed a notice of appeal and argue in their appeal that the trial court abused its discretion by

---

[1]To protect the children's identity, we will refer to the children and their family members by pseudonym. *See* TEX. R. APP. P. 9.8.

[2]The jury also found that Father failed to comply with the provisions of a court order that specifically established the actions necessary for the children's return. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O).

failing to grant their oral motion to continue the jury trial and by denying their motion for a directed verdict.

We conclude that sufficient evidence supported the jury's Ground E findings that Mother and Father engaged in conduct or knowingly placed Anna, Ben, and Brynn with persons who engaged in conduct that endangered their physical or emotional well-being. Because we also find that sufficient evidence supported the best-interest findings, we affirm the judgment terminating Mother's and Father's parental rights. As to the petition in intervention, we find no error in the trial court's decision to deny Tanya and Aaron's motions for a continuance and directed verdict. As a result, we affirm the trial court's judgment.

## I. Sufficient Evidence Supported the Jury's Decision to Terminate Parental Rights

### A. Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting *Horlick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). This Court is required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id.* (quoting *In re A.B.*, 437 S.W.3d at 500). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (quoting

*In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

Termination of parental rights requires "clear and convincing evidence[] that the parent has engaged in at least one statutory ground for termination and that termination is in the child[ren]'s best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007) (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009)). "This standard of proof necessarily affects our review of the evidence." *Id.*

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). We presume that the jury, "acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the [jury] could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d

4

105, 108 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine '"whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations."'" *Id.* (alteration in original) (quoting *In re H.R.M.*, 209 S.W.3d at 108 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002))); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). "'[I]n making this determination,' we must undertake 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (quoting *In re C.H.*, 89 S.W.3d at 26)). "We also recognize that the . . . fact-finder . . . is the sole arbiter of a witness' demeanor and credibility, and it may believe all, part, or none of a witness' testimony." *In re A.M.*, No. 06-18-00012-CV, 2018 WL 3077784, at *3 (Tex. App.—Texarkana June 22, 2018, pet. denied) (mem. op.) (citing *In re H.R.M.*, 209 S.W.3d at 109).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, 'the rights of natural parents are not absolute; protection of the child[ren] is paramount.'" *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994))) (citing *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely

to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.— Texarkana 2015, no pet.) (citing *In re C.H.*, 89 S.W.3d at 26)).

**B.    The Evidence at Trial**

Termination of parental rights under Ground E considers "what the parent[s] did both before and after the child was born." *In re M.C.*, 482 S.W.3d 675, 685 (Tex. App.—Texarkana 2016, pet. denied) (quoting *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.)). As a result, we examine the entire family history in our review.

**1.    The Choices that Led to the Children's Removal**

Mother was fourteen when she met Father. Even though Father was twenty or twenty-one at the time, Tanya allowed Mother to visit him. Mother and Father testified that they began dating and engaged in sexual activity when Mother was just sixteen years old. While Tanya wanted to file criminal charges against Father, she decided not to after Father enrolled in the military and left town. At trial, she described Father and Mother's relationship as appropriate even though Mother was a child and Father was an adult. When Mother was eighteen, Father left the military to be with her, and Tanya allowed him to move into her home until Mother and Father found their own home. After Anna was born in 2011 and Ben was born in 2012, the couple married in 2013. Mother and Father divorced in 2021 under circumstances discussed below.

By all accounts, Father was a hard worker and the breadwinner for the family. He worked twelve hours a day in the oil fields and was gone for three weeks at a time while Mother stayed home.

6

The jury, however, also heard testimony of drug use by both parents. Mother testified that, while she was home taking care of their kids, Father would buy drugs that they would use together. Mother stated that Father would purchase methamphetamine and use it with her, though, more often, cocaine was his drug of choice. While Father admitted to cocaine use before the children were born and marihuana use in 2013, he denied using drugs with Mother. Even so, Father was aware that Mother struggled with a methamphetamine addiction and that she used drugs when the children were left in her care, although not in their presence. Mother testified that Father moved his cousin, who was a drug dealer, into their home and that the cousin supplied methamphetamine to them, which they all used.

The record also showed that the couple began arguing. In 2016, Father testified that Ben witnessed an incident of domestic violence. In an application for a protective order against Mother, Father said that he and Mother stopped living together in December 2015 and that Mother was living with a boyfriend. Father's affidavit stated that Mother was "doing Xanax bars as well as crystal meth," that she had lost so much weight that he "could see her bones," and that she "looked like a corpse with no soul." When Father refused to give Mother, who wanted to leave, any money, she started cursing, grabbed Ben "by his shoulder and neck[,] and said she was taking him." Father wrote that Ben screamed and kicked until Mother dropped him and that when Father was near Ben, Mother struck Father in the back of the head twice. Father's affidavit confirmed that Ben saw the incident and asked Mother why she hit Father. Father added that Mother had been violent towards him before and that she would "leave for days at a time" to do methamphetamine. A protective order was issued against Mother in 2016.

7

Mother admitted that she would drop off Anna and Ben, either with Tanya or with her neighbor and family friend, Beatrice, and Beatrice's husband, Rick, while she disappeared to use drugs. Tanya was married to Aaron, who had previously been married to Beatrice for twenty years. Tanya and Aaron also rented a home that belonged to Rick. The couples were friends, and Aaron testified that Beatrice and Rick saw the children regularly, would celebrate birthdays with them, and would invite them to come swim in their pool. Everyone believed that Beatrice and Rick, who were described as a second set of grandparents to the children, were good people. Yet, in 2016, Anna made an outcry against Rick.

Mother testified that Anna said Rick put his hand "in her no-no square" and showed her his privates. Mother called Father to report Anna's outcry. While in Tanya's presence, Mother recorded Anna making a statement that was consistent with her outcry. The recording, which was played for the jury, showed Anna saying that Rick had touched her on her "tee-tee" over her clothes while she was sitting in his lap at McDonalds. In a handwritten voluntary statement to the City of Savoy Police Department (SPD), Mother said that she was in a car with her sister, her friend, and Anna when Anna said that Rick "ha[d] touched her and showed her his body parts." Mother's statement said Mother told Tanya and Beatrice about Anna's outcry but that "they blew up at [her]," that Tanya accused Anna of lying, and that Beatrice asked that Mother not report the incident. Mother's statement also said that Beatrice asked her to leave Anna with them in exchange for money.

Mother testified that Anna was interviewed at the Fannin County Child Advocacy Center (CAC) but that no outcry was made during the interview. Cody Shook, a sergeant with the SPD,

8

testified that law enforcement and Child Protective Services (CPS) investigations were conducted but that there was a lack of evidence to pursue the allegation against Rick any further. After hearing that, Mother and Father continued to allow Anna and Ben to be watched by Beatrice and Rick. Because Tanya did not believe the allegation against Rick, which she characterized as a "fairy tale," Tanya also continued allowing the children to go to Beatrice and Rick's home.

In 2017, Father's protective order against Mother was set to expire. Mother, who was pregnant, said that the trial court refused to extend the protective order at a January 2017 hearing after Mother showed the trial court text messages from Father that said he was sorry, wanted her to come home, and wanted to drop the assault charges. Mother testified that she and Father reconciled after that hearing. In February 2017, Brynn was born.

While Mother was sober during all her pregnancies, she returned to using drugs after Brynn's birth. Father testified that he noticed a change in Mother's appearance, that Mother admitted to using drugs again, and that Mother would again leave the children with Tanya and Aaron or Beatrice and Rick. Father also testified that Mother would allow her drug-addicted friend, Kami, who Father described as "beyond gone," to stay in the home with the children. Father said that he would come home from work to kick Kami out but that Mother would allow her to return.

In 2021, Father filed for divorce from Mother, which was granted in April 2021. Even though Father knew of Mother's drug use, he gave Mother the right to determine the children's primary residence under an agreed divorce decree. After the divorce, Mother and Father

9

continued to live together, even after Mother brought home a boyfriend who was using drugs with her in the home. After the boyfriend "put his hands around [her] throat and choked [her] out twice," Mother left him. Mother also testified that, around that time, she passed out after using drugs with two men, was "rape[d] and left for dead," and was taken to the hospital by paramedics.

In September 2021, Father said that Mother hit him in the face and was arrested for assaulting him, but Mother testified that Father pushed her first during the 2021 assault. Father testified that Mother overdosed on methamphetamine while the police were there. In October 2021, both Father and Mother tested positive for methamphetamine, and the children were removed from their care. After the children were taken, CPS reported to Shook that the children might have information about a missing person. According to Shook, the children had heard Mother and Kami discussing the missing person. Mother testified that she allowed Kami around the children and that they were present when Kami was being questioned about a deceased person, although they were out of earshot. In trying to gather more information, the children were taken for a forensic interview. Shook testified that, "[d]uring the first forensic interview with the children, there were allegations of physical abuse, allegations of someone trying to buy a child, and then some indicators of possible sexual abuse." Shook identified Beatrice and Rick as the perpetrators of the events in the children's outcries.

In October 2021, Shook questioned Father about the children's allegations in a recorded interview that was played for the jury. Although Father denied, during his direct testimony, that Beatrice had offered to purchase Anna, Father said on the recorded interview that approximately

two years before the interview, he and Mother had discussed an offer that Beatrice made to exchange $1,000.00 or $2,000.00 for Anna, money had exchanged hands at one point to cover attorney fees for Mother, and they tried to repay the funds because they did not want to be "obligated to [Beatrice]." Father told Shook that "it was a while back" when Anna had reported being strangled by Rick but that he did not believe Anna because she had no marks on her neck. Father and Shook also discussed the children's reports that they had been hit in the face and were forced to sleep on the floor. According to Shook, even though Father knew Beatrice had tried to buy Anna, the children were still being watched by her and Rick. Shook testified that, due to the allegations, Rick was facing charges for continuous sexual abuse of a child and injury to a child. Both Father and Mother were arrested and were facing charges for child endangerment for continuing to allow the children to be watched by Beatrice and Rick after Beatrice's offer. Father and Mother both testified that they believed Beatrice and Rick were good people before the allegations and were shocked to hear the children's outcries, which they both believed.[3]

### 2. Tanya and Aaron Are Ruled Out as Possible Placements for the Children

After the outcries, the children were removed from Mother and Father's home, and CPS began addressing the question of where to place them. CPS Program Director, Stephanie Garcia, testified that Tanya and Aaron were ruled out as an appropriate placement for the children. Garcia testified that Tanya herself had a long CPS history and could not keep her own children safe when she was raising them. According to Garcia, Tanya's children were physically and

---

[3]In December 2021, Father applied for a protective order on the children's behalf against Mother, Beatrice, and Rick. Father's protective order affidavit stated that Beatrice and Rick withheld food from the children and made Brynn "stand in the corner for extended periods of time." After the parties came to an agreement, Father dropped his pursuit of a protective order.

sexually abused while in Tanya's care. Tanya also testified that all three of her children were kicked out of school due to absences. Garcia said CPS services were offered to Tanya but that her children's abuse continued. Garcia testified that, in 2002, Tanya's ex-husband physically abused Mother and, as a result, Mother and her siblings were removed from Tanya's home. Garcia said that Mother's sister, Rose, who was a child, reported in 2012 that she had been sexually abused by Father, i.e., the father of Anna, Ben, and Brynn, and that Tanya continued to allow Rose to be around him.

At trial, Rose testified that Tanya left her alone with Father, who sexually molested her when she was eleven years old. Rose went into detail about the sexual abuse and said that Father continued to molest her occasionally for two years until Tanya caught them behind a fence while Father had his hand down her pants.[4] When questioned about the incident, Tanya said that she believed Rose's claim that Father was just massaging her. However, when Rose's friend reported the abuse to Tanya, Tanya believed the report and said that her son threatened Father with a firearm.

Rose testified that, when she was thirteen, she and Tanya moved in with Mother and Father and that Mother became aware of Rose's outcry. When asked why she moved in with Father and Mother after the abuse, Rose said that it was because Anna was born, and she did not want anything to happen to her. Tanya also said that she moved in with Mother and Father to protect the children and that Anna, Ben, and Brynn were raised by her and Rose while Mother and Father "continued with their drug life." Rose, who said that she did drugs with Mother and

---

[4]Father denied that he had abused Rose and claimed that she made up allegations because she was jealous of Mother's pregnancies and wanted attention.

Father and stopped going to school in the eighth grade, testified that she became pregnant with her son when she was sixteen and that Tanya had custody of him at the time of trial.

Jackie Schrodel and Julie Luton, the Court Appointed Special Advocates (CASA) for Anna and Brynn, testified that Tanya and Aaron's home was not an appropriate placement because Anna said that she had previously told Tanya about Rick's abuse but that nothing was done.[5] According to Schrodel, Tanya admitted over the phone that she still communicated with Beatrice and became upset when the CASA supervisor instructed her not to have contact with her. Luton testified that Tanya admitted that Beatrice and Rick were her and Aaron's friends and that they continued to talk over the phone and meet after the allegations came to light. At trial, when asked if she had a relationship with Beatrice and Rick, Tanya answered, "Through my husband . . . I do. It's -- it's not that we're best friends or anything like that by no means. Yes, we did have some gatherings . . . . But since all this has happened, they have not been to my house." Tanya also said that she continued to communicate with Beatrice about items Beatrice was selling, and Tanya and Aaron both testified that they allowed Beatrice and Rick access to the children even after Anna's 2016 outcry. Schrodel said Tanya did not seem to understand CASA's concerns.

### 3.    The Children Make Several Outcries After Placement

Because Tanya and Aaron were not deemed proper placements, the children were initially taken to a shelter after their removal but were eventually placed with Carissa Cane, who testified about the status of all three children. According to Cane, Anna said that Rick had

---

[5]Ben's CASA also testified that Tanya and Aaron's home was not a safe environment for Ben.

choked her. The child underwent a mental health crisis that required three separate hospitalizations. Cane testified that Anna would hear voices encouraging her to commit suicide and would feel physical sensations of pain from hallucinations that caused her to scream and scare the other children. Because she was seriously concerned that Anna would harm herself, Cane determined that she could no longer meet Anna's needs, and as a result, Anna was removed from Cane's home.

As for Brynn, Cane testified that she was "acting out sexually" from the first day she got to her home. When asked to clarify, Cane testified that Brynn asked her husband to take off her panties and later "began to touch other children in the home on the front and on the bottom." According to Cane, Brynn said that Rick touched her while pointing to "her front and her backside" and said that he hurt her, scratched her, and "watch[ed] them bathe, refusing to leave." Brynn also told Cane "many things about [Rick] that were sexually inappropriate that were done to her." Cane, who believed that Brynn had been assaulted, said that she witnessed Brynn telling her dolls that she was going to call the police, that they were going to jail, and that she was going to pull their heads off. Brynn also opened shower curtains while others were bathing. Although she talked to Brynn about her inappropriate behavior, the child continued to engage in it. Brynn was given more intensive therapy at the CAC, but Cane could no longer keep her after she became violent with Cane's own biological children.

Ben was the only child who continued to live with Cane. Cane testified that Ben reported that Rick "hurt[] them . . . [and] was physically mean to them." Mike Nejtek, Ben's CASA, testified that Ben's life with his family was "chaotic, and there ha[d] been outcries . . . that he

14

was involved in some of the sexual activities as well." Cane described Ben, who had improved due to weekly CAC therapy, as a warm and friendly child who interacted well with adults and children. Even though Ben was like a part of the family and was welcome to stay with Cane for as long as needed, she was not motivated to adopt him. Cane testified that Ben missed Mother and Father and that he would rather be living with a family member, although he rarely talked about Tanya and Aaron.

Schrodel testified that Anna made an outcry to her twice. On one occasion, Anna told Schrodel that she first saw a ghost when Rick was on top of her and began choking her when Anna tried to push him away. Anna said that she thought she was going to die during the choking and that Beatrice was in the home at the time. Anna told Schrodel that her parents did not make good decisions, that Mother had a problem with drugs, and that they were sometimes left alone. She also said that she had seen Mother miscarry because of her drug use. Schrodel testified:

> [Anna] began to tell me . . . that there were two other babies between I guess it would be [Ben] and [Brynn]. And I said, two other babies? Well, where are the babies? And she said, they were delivered in the potty. . . . And [Anna] began to tell us that her mom had a problem with drugs and that she would stay in her room a lot and sleep, and that a couple of times she came out and called for the children, and she had had these babies in the potty . . . . And that the one baby, [Ben] tried to flush, and it wouldn't go down the potty, and so he had to go get something to take this baby and put it somewhere. . . . The other time the baby -- the baby was flushed . . . and [Anna] said her mom went back to bed.

As for Brynn, Schrodel testified that the child was pulling out her hair, was obviously upset, and did not talk about her parents. According to Schrodel, Brynn made outcries of sexual abuse against Rick.[6]

Shalonda Scott, Anna's therapist, testified that Anna said that she had experienced sexual abuse from a family friend, that she suffered neglect at home, and that Ben and Brynn also experienced abuse and neglect. Anna said that Rick "didn't take his medication, that he would often get angry and hit them and touch them . . . in a sexual way." Although Anna remembered speaking up about the abuse when she was approximately four years old, she said that no one did anything to stop it. As a result, Scott said Anna was "hyper-focused on getting . . . putting [Rick] away."

Anna told Scott that Beatrice did not stop Rick's abuse. She also said that "[Beatrice] would bathe her because . . . [Anna] wasn't doing it well enough, but it made [her] uncomfortable because she felt like she was too old to be bathed by someone else." According to Scott, Anna reported that she was at Beatrice and Rick's home because they had tried to buy her and that Mother was paid to bring the children there. Anna said that seeing Beatrice gave her nightmares.

Shook's interview with Father showed that the children knew Mother had a problem with drugs because Mother would discuss it with them. Scott said Anna told her that her Mother was often in her bedroom with the door closed and that she took the lead role in caring for Ben and Brynn. As a result, Anna had separation anxiety and missed her siblings. Scott testified that

---

[6]Mother testified that she knew Anna had psychiatric issues and that Brynn was pulling out her hair by the handful.

16

Anna was diagnosed with major depressive disorder with psychosis but that she had had no recent hallucinations. Anna was protective of her Mother and Father and missed Tanya but never mentioned Aaron.

### 4. Plans for the Children's Futures

Father loved and wished to care for the children and had the financial means to provide for them but recognized that his bond conditions from the child endangerment allegation did not allow him to have contact with them. Father testified that he was fine with the children being placed with Tanya and Aaron if significant restrictions were in place. However, he also believed that it was in the children's best interests for them to be placed with his girlfriend, who he had only known for six to eight months.[7]

Mother, who had a long criminal history and was a convicted felon, knew she could not care for the children. Although she had also bonded out after her arrest for child endangerment, her bond was revoked for failing to appear for court hearings involving a pending burglary charge, and she remained in jail at the time of trial. She was also, at that time, facing community supervision revocation for a theft offense. Mother testified that she was an addict that needed help and that she felt lost. Even so, because she loved and had a bond with her children, she believed that they would be negatively impacted if she lost her parental rights. Mother testified that it was in the children's best interests to visit with her and be placed with Tanya and Aaron, who would not let the children have any more contact with Beatrice and Rick and were looking

---

[7]Father's girlfriend, who had not met the children, testified that she had a good home, a good job, and would be willing to care for Anna, Ben, and Brynn in whatever manner required. Yet, she testified that marriage to Father was not yet on the table because their relationship was new and that it was possible that the couple could break up after a fight. She also testified that she did not need to dig into the allegations Rose made against Father because Father had denied the allegations.

to move out of Rick's rental property. Mother noted that CPS had placed the children in three different homes with no plan for permanency and was concerned that they would never be together in a good placement if not sent to Tanya and Aaron.[8]

Scott believed that terminating parental rights would make Anna sad, that seeing her family occasionally would give her peace of mind, and that Anna could safely be placed with her siblings because her hallucinations were controlled. Scott was also in favor of supervised visitation with Father because of Anna's positive memories of him.

In contrast, Luton testified that it was in the children's best interests to have Mother's and Father's parental rights terminated. Although at the time of trial there was no permanent plan as to where Anna, Ben, and Brynn would live, the goal was for the children to be adopted together. While Schrodel said that Anna would be upset if parental rights were terminated and that it would be good for the child to see her parents, she did not feel that Mother and Father could care for Anna's daily needs. Garcia testified that Mother and Father had been offered CPS services in this case and in prior cases involving similar allegations of drug use, domestic violence, and sexual abuse outcries but had not changed their behavior. As a result, she believed that it was in the children's best interests for parental rights to be terminated.

Tanya testified that, while the children would be devastated if they could not see Mother again, neither Mother nor Father were capable of caring for them. Tanya said that she loved and cared for the children, who meant the world to her. Tanya and Aaron testified that the home rented from Rick had enough room for the children and that they had the financial means to

---

[8]Mother testified that Father would not endanger the children but also said that Anna "never really wanted to be around her dad very much because he was mean to her" and "whupped up on her."

provide for them well and continue them in therapy.[9]  Aaron, a volunteer firefighter for thirty years and former city councilman, told the jury that the children were a big part of his life and that he would continue to care for them if something happened to Tanya.  Tanya and Aaron both testified that they would keep the children away from Beatrice and Rick.  Tanya described Rick as "angry over every little thing" and said that she could hear him "all the time raise[] his voice." Even so, Tanya admitted that she believed the children had been coached by Father to make up the allegations and that Father had schemed with Mother to "put this on [Beatrice and Rick]."

### 5. The Jury's Verdict

After hearing this evidence, the jury determined that (1) Mother and Father had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being, (2) Mother and Father had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being, and (3) Father had failed to comply with provisions of a court order that established the actions necessary to obtain the children's return. The jury also found that termination of Mother's and Father's parental rights was in the children's best interests.  When asked who should be named as the children's managing conservator, the jury selected the Department over Tanya or Aaron.

### C. Sufficient Evidence Supported the Jury's Findings on Statutory Ground E for Termination of Mother's and Father's Parental Rights

"Only one predicate finding under Section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child[ren]'s best

---

[9]Aaron said that they were looking for another place to live.

interest." *In re L.E.S.*, 471 S.W.3d at 923 (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (quoting *In re A.V.*, 113 S.W.3d at 362) (citing *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.))).  When the trial court's findings under Grounds D or E are challenged on appeal, due process demands that we review the evidence supporting at least one of those grounds because they may implicate a parent's rights to other children.  *See In re N.G.*, 577 S.W.3d 230, 234, 237 (Tex. 2019) (per curiam); TEX. FAM. CODE ANN. § 161.001(b)(1)(M).  Here, we examine the jury's Ground E finding.

Ground E permits the termination of parental rights "if the court finds by clear and convincing evidence . . . that the parent has . . . engaged in conduct . . . which endangers the physical or emotional well-being of the child."  TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "'[E]ndanger' means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment."  *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012).  "'[E]ndanger' means to expose to loss or injury; to jeopardize."  *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re L.E.S.*, 471 S.W.3d at 923; *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.).

Mother and Father argue that the evidence is legally and factually insufficient to show that they endangered their children because there was no evidence that they abused them.  "It is not necessary that the conduct be directed at the child[ren] or that the child[ren] actually suffer injury."  *In re L.E.S.*, 471 S.W.3d at 923.  Under Ground "(E), it is sufficient that the child[ren]'s well-being is jeopardized or exposed to loss or injury."  *Id.* (citing *Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 367).

20

"Further, termination under [Ground] (E) must be based on more than a single act or omission. Instead, a 'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez v. Tex. Dep't of Protective & Regul. Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.))); *see Boyd*, 727 S.W.2d at 533; *In re N.S.G.*, 235 S.W.3d at 366–67. Ground E "refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act." *In re M.C.*, 482 S.W.3d at 685 (quoting *In re N.S.G.*, 235 S.W.3d at 366–67). "The conduct to be examined includes what the parent did both before and after the child was born." *Id.* at 685 (quoting *In re N.S.G.*, 235 S.W.3d at 367). "The endangering conduct may also occur 'either before or after the child's removal by the Department.'" *In re S.A.W.*, No. 06-21-00116-CV, 2022 WL 1193667, at *4 (Tex. App.—Texarkana Apr. 22, 2022, pet. denied) (mem. op.) (quoting *In re Z.J.*, No. 02-19-00118-CV, 2019 WL 6205252, at *11 (Tex. App.—Fort Worth Nov. 21, 2019, pet. denied) (mem. op.) (citing *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied))).

### 1. Analysis of Mother's Ground E Finding

Mother admitted that she was a drug addict who used methamphetamine while Anna, Ben, and Brynn were left in her care. "Drug use and its effect on a parent's life and [her] ability to parent may establish an endangering course of conduct." *In re J.L.B.*, 349 S.W.3d at 848 (quoting *In re N.S.G.*, 235 S.W.3d at 368)); *see In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009) (stating that parent's illegal drug use is often cited as conduct that will support affirmative

finding under Ground E).  Although Mother testified that she did not use drugs in front of the children, "'[b]ecause it exposes the child to the possibility that the parent may be impaired . . . , illegal drug use may support termination under' Ground E."  *In re H.M.J.*, No. 06-18-00009-CV, 2018 WL 3028980, at *5 (Tex. App.—Texarkana June 19, 2018, no pet.) (mem. op.) (quoting *In re A.L.*, No. 06-14-00050-CV, 2014 WL 5204888, at *7 (Tex. App.—Texarkana Oct. 8, 2014, no pet.) (mem. op.) (quoting *Walker*, 312 S.W.3d at 617)).

Here, there was ample evidence that Mother was impaired due to her drug use, which caused her to neglect her children.  Testimony from multiple witnesses showed that Mother would abandon the children for days at a time to use methamphetamine and that, when at home, she would stay in her bedroom while either the children cared for themselves or others were left to care for them.  Anna made outcries showing that she and Ben had witnessed their Mother miscarry and were left to deal with the aftermath of the tragedy.  Mother's desire to use drugs also led her to continue placing the children in danger by leaving them with Beatrice and Rick, even after Anna's 2016 outcry of sexual abuse.  All of the children made outcries of sexual or physical abuse against Rick.

Because of poor choices, Mother allowed known drug users like Kami and Father's cousin to move into the home with the children.  Mother's drug use caused arguments with Father.  A jury can consider a "history of abuse between the mother and the father for purposes of subsection[] . . . (E), even if the children are not always present."  *In re L.E.S.*, 471 S.W.3d at 923–24 (alteration in original) (quoting *In re Z.M.*, 456 S.W.3d 677, 686 (Tex. App.—Texarkana

22

2015, no pet.)). Mother was arrested on more than one occasion for assaulting Father during arguments, and the record showed that Ben had witnessed one of those assaults.

Also, Mother was a convicted felon and was in jail at the time of trial. "[I]mprisonment is certainly a factor to be considered by the trial court on the issue of endangerment" under Ground E. *In re N.S.G.*, 235 S.W.3d at 367 (quoting *Boyd*, 727 S.W.2d at 533). This is because "[a] parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *In re J.F.-G.*, 627 S.W.3d 304, 313 (Tex. 2021). In addition to her past offenses, Mother was facing charges for child endangerment, had missed hearings related to a burglary charge, and was subject to community supervision revocation for a theft offense.

Mother's drug use also exposed the children to the potential loss of a parent. Father testified that Mother had overdosed on drugs on one occasion while the police were in her presence, and Tanya testified that she had seen Mother "plenty of times being ODed." Mother exposed herself to situations that threatened her own safety, such as dating someone who choked her on more than one occasion and passing out after using drugs in front of two men who raped her and "left [her] for dead."

Mother acknowledged that she would not be able to care for the children alone and that she was a drug addict who needed help and was lost. Considering Mother's drug use, history of domestic violence, and poor decision making, we conclude that the evidence was both legally and factually sufficient for a rational jury to find that Mother engaged in a course of conduct that exposed her children to loss or injury and that such conduct endangered the physical or

23

emotional well-being of her children. As a result, we overrule Mother's point of error complaining about the jury's finding on statutory grounds for termination of parental rights.

### 2. Analysis of Father's Ground E Finding

We likewise find that the jury's Ground E finding against Father was supported by sufficient evidence.

As a guidepost for the sort of evidence that could preclude a reasonable jury from making a termination finding, we look to the recent Texas Supreme Court case of *In re J.W.*, 645 S.W.3d 726, 750 (Tex. 2022). On the facts of that case, the Texas Supreme Court held that a father's knowledge of a mother's drug use during pregnancy was not a sufficient basis for Ground E termination of the father's rights. The facts of that case, however, are illuminating and stand in stark contrast to the facts of the present case. In *In re J.W.*, the father made "what can only be described as a concerted effort to help [the m]other address her addiction" by seeking out treatment facilities that would accept expectant mothers, and then repeatedly taking her to those facilities, even after she had initially ceased treatment. *Id.*

Based on the evidence in this case, the jury could reasonably conclude that Father's conduct fell so far short of a "concerted effort to help" as to warrant Ground E termination. The evidence at trial showed that Father was well aware of Mother's drug use and knew that Mother abandoned the children to use drugs for days at a time. He also knew that Mother was allowing drug users into the home. Even though Mother was an addict, he continued to place the children in danger by allowing them to remain in Mother's care while he was absent for weeks at a time. In 2016, he filed an application for a protective order that said Mother had done so many drugs

24

that she "looked like a corpse with no soul" but then gave Mother the right to determine the children's primary residence under an agreed 2021 divorce decree.

Also, Father admitted to using drugs before the children were born. While he denied using drugs after Anna's birth, several witnesses, including Mother, Tanya, and Rose, testified that Father used drugs with Mother after the children were born. According to Mother and Tanya, Father moved his cousin, who was a drug-dealer, into the home. Father tested positive for methamphetamine in October 2021. As the fact-finder, the jury was free to disbelieve Father's claim that he was drug free.

Critically, the evidence at trial showed that Father knew about Anna's 2016 outcry of sexual abuse by Rick and about Beatrice's offer to purchase Anna. Even so, he continued to allow the children to stay in their home. When questioned by Scott about Beatrice's offer, Father volunteered that Anna had told him that Rick had strangled her and that the children reported that they were hit in the face and were made to sleep on the floor in Beatrice and Rick's home. Yet, Father did not report that conduct to the police and, instead, waited to be questioned by Scott. From this evidence, the jury was free to conclude that Father had failed to protect his children from Beatrice and Scott.

Father had bonded out of jail on his pending charge for child endangerment but still faced the possibility of imprisonment. During those proceedings, Rose's allegation of sexual abuse against Father had come to light, and Garcia had correctly testified that there was no statute of limitations that would bar prosecution of Rose's allegations.

25

After reviewing the evidence, we find it legally and factually sufficient for a rational jury to find that Father engaged in a course of conduct or knowingly placed the children with persons who engaged in conduct that exposed his children to loss or injury and that such conduct endangered the physical or emotional well-being of his children. Consequently, we overrule Father's point of error complaining about the jury's finding on statutory grounds for termination of his parental rights.[10]

### D.     Sufficient Evidence Supported the Jury's Best-Interests Findings

In their last point of error, Mother and Father challenge the jury's finding that termination of parental rights was in the best interests of Anna, Ben, and Brynn. "There is a strong presumption that keeping . . . child[ren] with a parent is in the child[ren]'s best interest." *In re A.B.*, 646 S.W.3d 83, 96 (Tex. App.—Texarkana 2022, pet. denied). "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

> In determining children's best interests, courts consider the following *Holley* factors:
>
> (1) the desires of the child[ren], (2) the emotional and physical needs of the child[ren] now and in the future, (3) the emotional and physical danger to the child[ren] now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child[ren] by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

---

[10]Because Father's brief wholly fails to challenge the jury's Ground O finding, we also conclude that sufficient evidence supported the jury's finding that Father failed to comply with provisions of a court order that established the actions necessary to obtain the children's return.

26

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b).

The Department is not required to present proof of each *Holley* factor. *In re M.C.*, 482 S.W.3d 675, 688 (Tex. App.—Texarkana 2016, pet. denied) (citing *In re C.H.*, 89 S.W.3d at 27). "When considering the child[ren]'s best interest[s], we may take into account that a parent is unable to provide adequate care for [his or her] child[ren], lacks parenting skills, or exercises poor judgment." *Id.* (citing *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.)). "Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child[ren]'s best interest[s]." *Id.* (citing *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.)). Also, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89 S.W.3d at 28.

The evidence at trial related to the first *Holley* factor showed that Father and Mother loved their children and that their children loved them. Scott testified that Anna had good memories of Father and that she was in favor of supervised visitations with him. Scott and Schrodel also said that Anna would be upset if parental rights were terminated. Cane testified that Brynn missed Mother and Father, and Ben's desires were not clear. Given this evidence, "[w]e find that the first *Holley* factor weighs against termination" of Father's and Mother's parental rights. *See In re Z.M.*, 456 S.W.3d 677, 689 (Tex. App.—Texarkana 2015, no pet.) (citing *In re E.N.C.*, 384 S.W.3d at 808).

27

Next, the emotional needs of the children now and in the future were great. The record showed that Anna suffered from hallucinations and separation anxiety and had thoughts of suicide. The record showed that all three children had suffered physical and sexual abuse and were in therapy. Brynn, who pulled out her hair, was in intensive therapy for the inappropriate behaviors she exhibited against others. Mother, who was jailed and had no income, recognized that she would be unable to care for the children on her own. *See In re Z.M.*, 456 S.W.3d at 689 ("A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs.") (quoting *In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *17 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied) (mem. op.)). Although Father could likely provide for the children's physical needs, the jury could infer that he would be unable to provide for their emotional needs based on his failure to protect them in the past, his pending criminal charges, and his testimony that it was in the children's best interests to be placed with a girlfriend he had only known for six to eight months. We find that the second *Holley* factor weighs in favor of termination of Mother's and Father's parental rights.

As to the third, fourth, seventh, and eighth *Holley* factors, "[e]vidence of past misconduct or neglect can be used to measure a parent's future conduct." *Id.* (quoting *In re I.R.K.-N.*, No. 10-13-00455-CV, 2014 WL 2069281, at *7 (Tex. App.—Waco May 15, 2014, pet. denied) (mem. op.) (citing *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue.")). The record shows that Mother and Father placed the children in physical and emotional danger by, among other things, allowing the children to remain with Beatrice and Rick

28

after they made allegations of physical and sexual abuse. The lack of their parental abilities was shown by both their actions and omissions that led to the children's removal. Testimony from several witnesses showed that Mother and Father both used drugs and that they both tested positive for methamphetamine in 2021. Witnesses testified that Father and Mother let other drug users into the home. Father, who remained absent from the home for weeks at a time, allowed the children to remain with Mother even though she was on drugs. Shook's interview with Father showed that Father knew Mother had discussed her drug addiction with the children. As a result, the children were often left to fend for themselves, and Anna said that she and Ben had witnessed their Mother's miscarriages. Father and Mother's home was unstable and was described by Nejtek as chaotic. The couple had separated in 2015 and engaged in arguments that led to domestic violence, including one instance viewed by Ben. Mother and Father were both facing criminal charges for child endangerment. As a result, we find that the third, fourth, seventh, and eighth *Holley* factors weigh in favor of terminating parental rights.

Turning to the fifth factor, we note that there were several programs available to assist Mother and Father. However, Father did not complete his family service plan in this case and, as a result, did not do what was necessary to obtain the children's return. Garcia testified that CPS had also offered Mother and Father services "not only during this case but in prior cases where some of the same things were happening, drug usage, domestic violence, [and] sexual abuse outcries," but Mother and Father had not changed their behaviors. Father and Mother both testified that Mother was able to remain sober during her pregnancies but had relapsed at several points in her life, showing that the Department's programs to assist Mother in remaining drug-

free in prior CPS investigations had failed. As a result, we find that the fifth *Holley* factor supports termination of Mother's and Father's parental rights.

As for the plans for the children, Father testified that it is was in their best interests to be placed with his girlfriend. The girlfriend, who had successfully raised her own children, testified that she had an appropriate, three-bedroom home and was willing to care for the children. Yet, the children had never met Father's girlfriend, and as a result, Mother testified—and the jury was free to believe—that placing the children with her was inappropriate. Although she was unable to care for them on her own, Mother wished for the children to be placed with Tanya so that she could attend in-patient rehabilitation for her drug addiction. The Department did not have a permanent solution as to where to place the children, who were all in different foster homes without the prospect for adoption. Even so, the Department's witnesses testified that Tanya's home was inappropriate and that it was in the best interests of the children for parental rights to be terminated so that they could hopefully be adopted by one family in the future. Based on the emotional and physical danger suffered by the children while in Mother's and Father's care, the jury was free to conclude that the Department's plan was in the children's best interests. As a result, we find that the sixth *Holley* factor weighs in favor of termination of parental rights.

The last *Holley* factor also supports termination of parental rights. Mother had no excuses for her acts or omissions that caused the children's removal. Instead, "she recognized and embraced her failures as a parent and was trying to resolve her criminal matters" and her drug addiction but had not yet done so by the time of trial. Father also offered no excuses for continuing to allow the children to be supervised by Mother, who he knew was a drug addict. As

for Father's failure to report the children's outcries of physical abuse by Rick, Father testified that he did not believe Anna's outcry that she was strangled by Rick because he did not see any marks on her neck. He offered no excuse for why he did not report Anna's, Ben's, and Brynn's outcries of being hit in the face or forced to sleep on the floor. As to why he continued to allow Beatrice and Rick to watch the children after Anna's 2016 outcry of sexual abuse, Father testified that it was because the police investigation into the allegations was closed, but he failed to explain why the children were sent to Beatrice and Rick's home after Beatrice offered to purchase Anna.

After reviewing the *Holley* factors and considering the entirety of the record before us, we find that the clear and convincing evidence presented at trial was legally and factually sufficient to support the jury's best-interest findings as to both Mother and Father. As a result, we overrule Mother's and Father's last point of error and affirm the judgment terminating their parental rights.

## II. There Is No Error in the Trial Court's Rulings on Intervenors' Motions

By separate appeal, Tanya and Aaron argue that the trial court erred when it denied their motion for a continuance and motion for a directed verdict. We disagree.

### A. Denying the Motion for a Continuance Was Not an Abuse of Discretion

#### 1. Factual Background

After Father testified and Mother began her testimony, Tanya was admitted to the hospital for chest pain and shortness of breath. As a result, Intervenors' counsel orally moved to continue the jury trial. Commenting on the fact that Aaron was available, the trial court denied

31

the motion for a continuance and said, "[I]f we get to the point where it's Intervenors' case, then the Court will consider additional medical information and consider at that point any continuance of the case." When Mother had concluded her testimony, Intervenors' counsel reported that Tanya was being treated for ulcers and possibly a collapsed lung but would be released and was expected to return to trial that afternoon. Luton testified and Scott began her testimony when, before Intervenors presented their witnesses, Tanya appeared at trial. Tanya was in the courtroom for a portion of Scott's testimony, as well as testimony from Shook, Cane, Schrodel, Nejtek, Garcia, Rose, and Father's girlfriend.

### 2. Standard of Review

"A trial court's decision to grant or deny a motion for continuance is within the trial court's discretion." *In re J.D.*, No. 06-18-00105-CV, 2019 WL 1302932, at \*6 (Tex. App.—Texarkana Mar. 22, 2019, no pet.) (citing TEX. R. CIV. P. 251). "A trial court's denial of a motion for continuance will not be disturbed unless the record reveals a clear abuse of discretion." *Id.* (citing *State v. Wood Oil Distrib., Inc.*, 751 S.W.2d 863, 865 (Tex. 1988)). "We are not to substitute our judgment for the trial court's, but are to decide only whether the trial court's ruling was so arbitrary as to exceed the bounds of reasonable discretion." *Id.* (citing *Philipp Bros., Inc. v. Oil Country Specialists, Ltd.*, 709 S.W.2d 262, 265 (Tex. App.—Houston [1st Dist.] 1986, writ dism'd)). "A trial court abuses its discretion if its ruling is arbitrary, unreasonable, and without reference to any guiding rules and principles." *Id.* (citing *Mercedes-Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex. 1996)).

32

### 3. Analysis

"Rule 251 of the Texas Rules of Civil Procedure requires a motion for continuance to be in writing and 'supported by an affidavit.'" *In re T.C.H.*, No. 06-16-00054-CV, 2016 WL 7175291, at \*6 (Tex. App.—Texarkana Dec. 8, 2016, no pet.) (mem. op.) (quoting Tex. R. Civ. P. 251). "If a party's motion for continuance is not made in writing and verified, then we will presume the trial court did not abuse its discretion." *In re J.D.*, 2019 WL 1302932, at \*7; *see In re T.C.H.*, 2016 WL 7175291, at \*6; *see also In re R.S.*, No. 02-22-00306-CV, 2022 WL 17687432, at \*6 (Tex. App.—Fort Worth Dec. 15, 2022, pet. denied) (mem. op.) (finding that oral motions for continuance fail to preserve error).

Here, Intervenors' counsel did not file a written motion for a continuance that complied with Rule 251. Given the lack of compliance with Rule 251 and that "[t]he goal of establishing a stable, permanent home for a child is a compelling government interest," we cannot conclude that the trial court abused its discretion by denying the oral motion for a continuance. *In re M.A.N.M.*, 75 S.W.3d 73, 77 (Tex. App.—San Antonio 2002, no pet.); *see In re J.D.*, 2019 WL 1302932, at \*7; *see In re T.C.H.*, 2016 WL 7175291, at \*6; *In re A.D.A.*, 287 S.W.3d 382, 387 (Tex. App.—Texarkana 2009, no pet.). As a result, we overrule Intervenors' first point of error.

### B. Denial of the Motion for a Directed Verdict Was Proper

#### 1. Standard of Review

Next, a trial court may direct a verdict if no evidence of probative force raises a factual issue on the material questions in the lawsuit. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994) (per curiam). An appellate court reviews a trial court's decision to grant or deny

a motion for a directed verdict under a legal sufficiency standard of review. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005).

### 2. Factual Background

The Department's witnesses said that the children were doing well in foster care and were improving with therapy. Scott testified that Anna did not really talk about Tanya or Aaron, and Schrodel said that Anna did not mention Tanya. Scott also testified that Anna was "sad" about not seeing Tanya, "but not too much to where it affected her daily life." Cane testified that Ben spoke of Tanya and Aaron "[v]ery little."

Luton and Schrodel testified that Tanya and Aaron were not an appropriate placement for the children because they knew about Anna's 2016 outcry, still allowed Beatrice and Rick to care for the children, remained in contact with Beatrice and Rick, and rented a home that belonged to Rick. According to Luton and Nejtek, Tanya would not provide a safe environment for the children. The jury heard that, even though Tanya knew Mother was a drug addict who had overdosed, she returned the children to Mother after her drug binges. Garcia testified that Tanya herself had a long CPS history, that her children were physically abused while in her care, and that Tanya had failed to protect Mother and Rose, who were both drug addicts, from Father's sexual assaults. After this testimony was presented, Intervenors moved for a directed verdict.

### 3. Analysis

The motion for a directed verdict was based on Section 153.433(a) of the Texas Family Code, which states:

(a)     The court may order reasonable possession of or access to a grandchild by a grandparent if:

34

> (1)    at the time the relief is requested, at least one biological or adoptive parent of the child has not had that parent's parental rights terminated;
>
> (2)    the grandparent requesting possession of or access to the child overcomes the presumption that a parent acts in the best interest of the parent's child by proving by a preponderance of the evidence that denial of possession of or access to the child would significantly impair the child's physical health or emotional well-being; and
>
> (3)    the grandparent requesting possession of or access to the child is a parent of a parent of the child and that parent of the child [meets one of the four criteria listed in the statute].

TEX. FAM. CODE ANN. § 153.433(a).

First, we note that, under Section 153.433(a)(3), Aaron had no standing to seek grandparent access. Section 153.432 states that a suit for possession or access must be filed by "[a] biological or adoptive grandparent." TEX. FAM. CODE ANN. § 153.432(a). Therefore, a step-grandparent who "is not a biological or an adoptive grandparent . . . lacks standing to seek grandparent access under section 153.432 of the Family Code." *In re Derzapf*, 219 S.W.3d 327, 332 (Tex. 2007) (per curiam) (orig. proceeding). Thus, the trial court did not err by denying the motion for a directed verdict as to Aaron.

Turning to Tanya's claim, Intervenors' counsel argued that a directed verdict was proper because (1) parental rights had not yet been terminated, (2) Tanya had overcome the presumption that Mother and Father acted in the children's best interests, and (3) "there was no witness brought by CPS that said that possession of or access by the grandparents . . . would be a detriment to the child[ren]'s well-being." Because the Department concedes the first two arguments, we focus on the third.

35

It is the grandparent's burden to prove "by a preponderance of the evidence that denial of possession of or access . . . would *significantly* impair the child's physical health or emotional well-being." *In re M.T.C.*, 299 S.W.3d 474, 481 (Tex. App.—Texarkana 2009, no pet.) (emphasis added) (quoting *In re Chambless*, 257 S.W.3d 698, 700 (Tex. 2008) (per curiam) (orig. proceeding)). At the time of the motion for a directed verdict, neither Tanya nor Aaron had testified. Yet, before the motion for a directed verdict, there was ample evidence at trial showing that the children were doing well in their placements and that Tanya's home was inappropriate for the children because, among other things, Tanya would not be protective of them.

As a result, testimony from the Department's witnesses was sufficient to create a fact question as to whether denial of Tanya's possession of or access to the children would significantly impair the children's physical health or emotional well-being. We find that the trial court properly denied the motion for a directed verdict as to Tanya.

We overrule the Intervenors' last point of error.

### III.   Conclusion

We affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted:     January 18, 2023
Date Decided:       February 6, 2023

36